RECEIVED

JUL 2 2 2019
2016R00370/jmm

AT 8:30＿＿＿＿＿＿M
WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. (JMV) |
| v. | : | Crim. No.: 19- 514 |
| DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO. LTD., | : | 18 U.S.C. §§ 371, 1956(h), and 2 50 U.S.C. § 1705(c) |
| MA XIAOHONG, ZHOU JIANSHU, LUO CHUANXU, and HONG JINHUA | : | |

## INDICTMENT

### Count One
### (Conspiracy to Violate the International Emergency Economic Powers Act and Defraud the United States)

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

Introduction

At all times relevant to this Indictment:

1.      The city of Dandong in the Liaoning province of the People's Republic of China was on the border with the Democratic People's Republic of Korea ("North Korea" or "DPRK").  It was one of the largest cities on the China-North Korea border and was a significant location for trade between China and North Korea.

2.      The Korea Kwangsong Banking Corporation ("KKBC"), a North Korean bank, maintained an office in Dandong.

3.      In or about August 2009, KKBC was publicly named a "Specially Designated National" by the United States Department of the Treasury under Executive Order 13382, issued pursuant to the International Emergency Economic Powers Act ("IEEPA").  Accordingly, KKBC was prohibited from using the United States' financial institutions for any reason, and it was a crime for anyone or any business entity to willfully assist KKBC in evading the prohibition.  50 U.S.C. § 1705.

<u>Ma Xiaohong</u>

4.      Since in or about 1996, defendant MA XIAOHONG ("MA") was engaged in trade with and on behalf of North Korea from her base in Dandong. In or about 2002, defendant MA opened up her own company for the purpose of trade with North Korea.

5.      Defendant MA used a company she formed, the Liaoning Hongxiang Industrial Group, to operate a series of businesses, most of which use "Dandong Hongxiang" as part of their names.  Such companies included Dandong Hongxiang Industrial Development ("DHID"), Dandong Hongxiang International Freight Forwarders, Dandong Hongxiang Travel Agency, and Dandong Hongxiang Real Estate, among others.

6.      Defendant MA was the principal shareholder and senior executive of defendant DHID.  As set forth below, she was also the sole owner and shareholder of many companies that served as front companies.  Those front companies were created by or acquired by DHID employees for the purposes of transacting business in U.S. dollars for or on behalf of KKBC and other North

2

Korean entities while evading the U.S. government's prohibitions against such financial transactions.

Dandong Hongxiang Industrial Development Co, Ltd ("DHID")

7.      Defendant DHID was a Chinese company whose core business was trade with North Korea.

8.      According to a DHID PowerPoint presentation, defendant DHID was an enterprise that conducted North Korean import and export business, had a ten-year history of conducting business with North Korea, and had a trading value of 250 million U.S. dollars in 2010, which accounted for more than 20% of total trading volume between China and North Korea at that time. Further, according to the presentation, DHID's customers were: (a) companies affiliated with the North Korean Government who controlled the purchase of bulk goods and equipment, (b) North Korean representatives permanently residing in China who were sent to China by DPRK companies to make their own purchase orders, (c) China Commerce Department bidding projects to aid North Korea, and (d) small companies or individuals who did not have a license to import/export on their own, or needed to use DHID to get a better purchase price.

9.     The presentation identified the DPRK as defendant DHID's primary customer.   According to the presentation, in the three years after 2009, DHID's export volume to North Korea increased 30% annually and was likely to increase by more than 10% in the future.  Further, the presentation identified

one of defendant DHID's disadvantages as business risks associated with the North Korean situation.

10.    Due to defendant MA's close relationship with North Korean officials, she allowed her personal bank account to be used for DHID payments on behalf of a North Korean official in Russia who requested that transactions be conducted in U.S. dollars.

11.    Since on or about August 2009, defendant DHID's growth in business related, at least in part, to its work on behalf of KKBC.  Soon after the August 2009 designation of KKBC, which designation blocked the bank's access to the U.S. financial system, defendant DHID began making payments in U.S. dollars on behalf of KKBC, and these payments grew significantly over time.  Defendant DHID's U.S. correspondent banking transactions increased from approximately $1.3 million for the approximate three years prior to KKBC's designation to approximately $110 million from 2011 to 2014, after KKBC was designated.

12.    As set forth in more detail below, even after August 2009 when KKBC was designated, and defendant DHID and its co-conspirators knew of this designation, defendant DHID, the individual defendants, and their co-conspirators continued to engage in transactions in U.S. dollars through the U.S. financial system on behalf of KKBC and other North Korean entities.

Zhou Jianshu

13.    Defendant ZHOU JIANSHU ("ZHOU") was the general manager of defendant DHID and worked directly for defendant MA.  Defendant ZHOU, at

4

times coordinating with other DHID employees, established numerous front companies. The front companies were used to transact U.S. dollar financial transactions that cleared through the United States on behalf of KKBC, in violation of IEEPA. Defendant ZHOU incorporated several of the front companies using his own personal identifying information. Defendant ZHOU was the sole owner and shareholder of several such companies.

14.    Defendant ZHOU oversaw both the logistics and payments for at least three separate U.S. dollar transactions conducted on behalf of KKBC. Those three transactions violated IEEPA. He also coordinated payments to goods and commodities companies in U.S. dollars, using defendant DHID and its front companies to conceal North Korea's identity as the purchaser of the goods and commodities.

Luo Chuanxu

15.    Defendant LUO CHUANXU ("LUO") was a financial manager at DHID and served as an assistant to defendants MA and ZHOU. Defendant LUO was involved in the creation of front companies for the purpose of conducting U.S. dollar transactions on behalf of North Korea-based entities. Defendant LUO was also involved in making payments to vendors who supplied commodities to the DPRK. Defendant LUO was the CEO of at least two of the front companies established on behalf of DHID. For certain transactions, defendant LUO attempted to conceal the fact that North Korea was the supplier of commodities being exported from North Korea.

16.     Defendant LUO communicated in coded language with potential buyers of North Korean goods in order to conceal the fact that North Korea was the source of the products.

Hong Jinhua

17.     Defendant HONG JINHUA ("HONG") was the deputy general manager of DHID and worked directly for MA.  Defendant HONG, at times coordinating with other DHID employees, registered front companies, and managed U.S. dollar bank account information on behalf of DHID and its front companies.  Defendant HONG established several of the front companies using her own personal identifying information.  Defendant HONG was the director of these companies.

18.     During the period after KKBC was designated by the United States Department of the Treasury, defendant HONG maintained regular email contact with at least two different KKBC representatives, and played a role in managing the banking activities between defendant DHID and KKBC. Defendant HONG received KKBC bank statements summarizing U.S. dollar financial transactions between KKBC and defendant DHID.  The bank statements were printed on official KKBC letterhead.  The transactions reflected on the bank statements involved U.S. dollars moving into and out of a DHID account held at a KKBC branch in North Korea to fund commodity purchases made by DHID on behalf of North Korean trading companies that were funded or guaranteed by KKBC.

## The International Emergency Economic Powers Act

19.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701-1705, granted the President of the United States authority to deal with unusual and extraordinary threats to the national security, foreign policy or economy of the United States. 50 U.S.C. § 1701(a). The President was authorized to declare a national emergency and to impose economic sanctions in response to those threats.  Under IEEPA, it was a crime to willfully violate, attempt to violate, conspire to violate or cause a violation of any license, order, regulation or prohibition issued pursuant to the Statute. 50 U.S.C. §§ 1705(a) and 1705(c).

20.     On November 14, 1994, the President issued Executive Order 12938, finding "that the proliferation of nuclear, biological, and chemical weapons ("weapons of mass destruction") and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

21.     On June 28, 2005, the President issued Executive Order 13382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters") to target proliferators of weapons of mass destruction ("WMD") and their support networks and deny designated proliferators access to the U.S. financial and commercial systems.

22.     Executive Order 13382 authorized the United States Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions,

including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Order. Pursuant to that authority, on April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations" (the "WMDPSR"), 31 C.F.R. § 544.101 *et seq.*

<u>The Weapons of Mass Destruction Proliferators Sanctions Regulations</u>

23.     Among other things, Executive Order 13382 and the WMDPSR:

a.     Authorized the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") to sanction individuals and entities facilitating the proliferation of weapons of mass destruction by placing such individuals or entities on the Specially Designated Nationals list, 31 C.F.R. § 544.201(a). As part of its enforcement efforts, OFAC published a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. Collectively, such individuals and companies were called "Specially Designated Nationals" or "SDNs." SDNs' assets were blocked and U.S. persons were prohibited from dealing with them without first obtaining a license or other written authorization from OFAC. For purposes of Executive Order 13382 and the WMDPSR, a "U.S. person" included any entity such as a financial institution organized under the laws of the United States or any jurisdiction within the United States, 31 C.F.R. § 544.312.

b.     Prohibited transactions or dealings, except as authorized or licensed by OFAC, by any U.S. person or within the United States with individuals and entities who had been placed on the SDN list, included (a) "[T]he

making of any contribution or provision of funds, goods, or services by, to, or for the benefit or any person [on the SDN list]"; and (b) "[T]he receipt of any contribution or provision of funds, goods, or services from any person [on the SDN list]," 31 C.F.R. § 544.201(b);

       c.    Prohibited any transaction by a U.S. person or within the United States that evaded or avoided, had the purpose of evading or avoiding, or attempted to violate any of the prohibitions set forth in Executive Order 13382 and the WMDPSR, 31 C.F.R. § 544.205; and,

       d.    Prohibited any non-U.S. person such as a corporation from causing financial or other services to be provided by a U.S. person for the benefit of a person or entity on the SDN list within the United States, except as authorized or licensed by OFAC, 31 C.F.R. § 544.405.

       e.    On August 11, 2009, OFAC designated KKBC pursuant to Executive Order 13382 as a Specially Designated National in connection with the proliferation of weapons of mass destruction, thereby subjecting KKBC to the prohibitions contained in 31 C.F.R. Part 544, Subpart B.

    24.    At no time before or after this designation in August 2009 did KKBC apply for, receive, or possess a license or authorization from OFAC to engage in any transaction or dealing with a U.S. person or within the United States.

<u>North Korea's Banking Practices</u>

    25.    North Korea needed to both sell certain commodities and buy commodities and services in international markets. To obtain goods and services in the international marketplace, North Korea needed access to U.S. dollars,

because certain international vendors preferred or required that purchases be made in U.S. dollars. When businesses engaged in U.S. dollar transactions overseas other than by the delivery of cash, those funds generally had to be moved through, or "cleared" through, a bank in the United States. Accordingly, to engage in U.S. dollar transactions, North Korea and North Korean entities needed access to the U.S. financial system.

26.   A correspondent bank was a financial institution that provided financial services on behalf of another financial institution. Correspondent bank facilitated wire transfers, conducted business transactions, accepted deposits and gathered documents on behalf of other financial institutions. Correspondent banks were able to support international wire transfers for their customers in currencies that the foreign customer banks normally did not hold on reserve, such as U.S. dollars. Correspondent banks in the U.S. facilitated wire transfers by allowing foreign banks located exclusively overseas to maintain accounts at the correspondent banks in the United States. The funds used in foreign U.S. dollar transactions cleared through such accounts.

27.   As a result of its designation in August 2009, KKBC lost access to both the U.S. financial system and to U.S. correspondent banks. Consequently, KKBC lost the ability to conduct transactions in U.S. dollars. After August 2009, KKBC illegally disguised its U.S. dollar transactions using non-designated entities such as DHID and its front companies. By conspiring with the defendants, and by using the front companies created by DHID, KKBC engaged

in financial transactions that transited the U.S. financial system, in violation of United States sanctions regulations and IEEPA.

The Conspiracy

28.     From on or about December 9, 2009, through in or about September 2015, in Essex County, in the District of New Jersey and elsewhere, the defendants,

DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO. LTD.,
MA XIAOHONG,
ZHOU JIANSHU,
LUO CHUANXU, and
HONG JINHUA,

and others did knowingly and intentionally conspire and agree with each other and others:

a.     to violate, evade, and avoid the restrictions imposed by the Office of Foreign Assets Control, U.S. Department of the Treasury, under the Weapons of Mass Destruction Proliferators Sanctions Regulations, Title 31, Code of Federal Regulations, Section 544.101, *et seq.*, by providing services on behalf of and for the benefit of a Specially Designated National, to wit, Korea Kwangson Banking Corp. ("KKBC"), without first having obtained a license or other written authorization from the Office of Foreign Assets Control, and

b.     to defraud the United States government by interfering with and obstructing a lawful government function, that is, the enforcement of the Weapons of Mass Destruction Proliferators Sanctions Regulations, by deceit, craft, trickery, and dishonest means, contrary to Title 50, United States Code,

Section 1705(c), and Title 31, Code of Federal Regulations, Sections 544.201 and 544.205.

## Objects of the Conspiracy

29.    The objects of the conspiracy were:

a.    To transact business on behalf of SDNs using U.S. financial institutions despite the legal prohibition against such transactions, and to profit from engaging in such transactions;

b.    To conceal from and mislead U.S. financial institutions that a non-designated entity was sending U.S. dollars to non-sanctioned commodity or goods traders; and

c.    To willfully evade or violate, and to cause others to evade or to violate the regulations and prohibitions, and licensing requirements of IEEPA, Executive Order 13382, and the WMDPSR.

## Manner and Means Of The Conspiracy

30.    It was a part of the conspiracy that after the designation of KKBC by U.S. Treasury Officials in August 2009, defendants MA, ZHOU, LUO, HONG and DHID created or acquired at least 22 front companies that were incorporated in Hong Kong, the British Virgin Islands, England, Seychelles, Wales and Anguilla, among others.  For most of these companies, the defendants, or those close to them, were listed as the CEOs, directors, and sole shareholders.  Many of the front companies shared the same addresses in the British Virgin Islands or in Hong Kong.

31.   It was further a part of the conspiracy that the co-conspirators opened bank accounts held in the names of the front companies at 12 banks in China that maintained correspondent accounts with the U.S.

32.   It was further a part of the conspiracy that the U.S. dollar transactions were conducted in the name of a front company, creating the appearance that the U.S. correspondent bank, for example, a British Virgin Islands ("BVI") or Hong Kong-based trading company, was sending U.S. dollars to a non-sanctioned commodity or goods trader somewhere outside the United States.

33.   It was further a part of the conspiracy that U.S. correspondent banks would process transactions that would not have been processed had the correspondent banks known that KKBC had funded or guaranteed defendant DHID's front company.

34.   It was further a part of the conspiracy that the bank accounts held by the front companies' accounts were funded by defendant DHID with U.S. dollars from designated parties in North Korea and were used to pay for purchases destined for North Korea.  In this way, defendant DHID and the front companies acted as the business entities through which designated North Korean entities, such as KKBC, accessed the U.S. financial system.

35.   It was further a part of the conspiracy that, at times, the front companies processed transactions funded or guaranteed by KKBC that transited through U.S. financial institutions.

36.   It was further a part of the conspiracy that, at times, the defendants—using the front companies they controlled—managed the full logistical chain of supply and payment for commodity contracts that were in fact guaranteed or funded by KKBC for North Korea-based entities.   The defendants did so to ensure the performance and payment of specific commodity purchases that were made in U.S. dollars.   In the course of the conspiracy, one or more of the correspondent processing centers involved in the international wire transfers on behalf of or for the benefit of KKBC described herein were located in the District of New Jersey.

37.   It was further a part of the conspiracy that the prices the defendants charged for goods purchased by KKBC or with its guarantees were substantially higher than the prices charged for transactions that did not involve sanctioned entities.

38.   It was further a part of the conspiracy that defendant MA oversaw and directed financial transactions conducted by defendant DHID that were intended to circumvent the prohibition against KKBC's use of the U.S. financial system.   Defendant MA's signature was stamped on documents outlining the logistics of transactions guaranteed by KKBC that transacted through the U.S. in violation of IEEPA and the money laundering statutes.

39.   It was further a part of the conspiracy that at no time relevant to this Indictment did any defendants apply for, receive, or possess a license or authorization from OFAC to engage in any transactions or dealings with a U.S. person or within the United States for the benefit of KKBC.

## Overt Acts

40.    In furtherance of the conspiracy, and to effect the illegal objects thereof, defendants DHID, MA, ZHOU, LUO, HONG, and their co-conspirators committed and caused to be committed the following overt acts, among others, in the District of New Jersey and elsewhere:

a.    On or about December 1, 2009, individuals affiliated with the North Korean government directed defendant ZHOU to forward an email to "CEO MA," with directions to reply back immediately, containing a U.S. dollar-denominated contract guaranteed by KKBC in which defendant DHID acted as a third party payer.

b.    In or about December 2009, the KKBC branch office in Dandong contracted with defendant DHID to be a third-party payer on a $6.85 million contract to purchase refined sugar using U.S. dollars for a North Korean company ("Company A"). Defendant DHID was identified on the contract as "the agent of the North Korean party."

c.    In or about September 2009, defendants ZHOU and LUO coordinated U.S. dollar payments to a Singapore-based urea distributor ("Singapore Distributor") for the benefit of KKBC.

d.    On December 9, 2009, a DHID front company made an approximately $500,000 payment to the Singapore Distributor. The funds were transferred from a DHID front company account at China Merchants Bank in Shenzhen, China through China Merchants Bank's correspondent account at

15

Deutsche Bank AG and another U.S. correspondent account in the United States.

        e.    On or about December 6, 2011, defendant ZHOU emailed a China-based fertilizer distributor ("Chinese Distributor") about a contract for DHID's purchase of fertilizer. The contract was guaranteed by KKBC, and DHID had coordinated the purchase on behalf of another North Korean company ("Company B").

        f.    On January 16, 2012, a DHID front company paid the Chinese Distributor approximately $1,014,163.90. The funds were transferred to the Chinese Distributor from the DHID front company's account at China Merchants Bank using China Merchants bank's correspondent account in the U.S.

        g.    On or about March 6, 2013, defendant ZHOU emailed a representative of Company B an offer by defendant DHID to sell Company B approximately 20,000 metric tons of fertilizer. Under the terms of the offer, DHID agreed to sell Company B approximately 20,000 tons of fertilizer packaged in 50 kilogram bags. The fertilizer was to be shipped from a port in China at the price of approximately $480 per metric ton. The email further specified that the offer would be valid until on or about March 10, 2013. The offer also stated that before loading the cargo, defendant DHID first had to receive confirmation from KKBC that payment for the fertilizer had been deposited into a KKBC account by Company B.

        h.    From on or about May 6, 2013 through on or about June 21, 2013, DHID deposited approximately $4,835,530 into a bank account at China

Merchants Bank held by one of its front companies registered in the British Virgin Islands.  The approximately $4,835,530 deposited in the front company's account was a payment to the Singapore Distributor.  These funds were wired from China to the U.S. financial system using a U.S. correspondent bank account at Standard Chartered Bank and processed through Standard Chartered Bank's processing facility in Newark, New Jersey.

       i.     On or about January 3, 2014, defendant DHID sent Company B an offer to sell approximately 10,000 metric tons of fertilizer, conditioned on a thirty percent deposit from Company B and "a letter of credit from [KKBC] for the remaining 70% guaranteeing payment within 3 months from the [bill of lading] date."

       j.     On or about September 1, 2015, KKBC transferred approximately $500,000 to a U.S. dollar account defendant DHID maintained at a North Korean branch of KKBC.

       k.     In or about 2013, in an email between defendant ZHOU and representatives from a Swiss company regarding a contract guaranteed by KKBC with a North Korea-based trading company, defendant ZHOU represented that defendant DHID and one of its front companies were "not owned or controlled or in any way linked to a sanctioned North Korean person/entity. . . . "  Around the same time, defendant ZHOU also sent an email to the Swiss company, attaching a document that reported on KKBC's designation.

      In violation of Title 18, United States Code, Section 371.

## Count Two
### (Conspiracy to Launder Monetary Instruments)

1.    The allegations set forth in Paragraphs 1 through 27 and 29 through 40 of Count One of this Indictment are incorporated and re-alleged by reference herein.

2.    From on or about December 9, 2009, through in or about September 2015, in Essex County, in the District of New Jersey and elsewhere, the defendants,

DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO. LTD.,
MA XIAOHONG,
ZHOU JIANSHU,
HONG JINHUA, and
LUO CHUANXU,

and others did knowingly and intentionally conspire and agree with each other and others:

a.    to transport, transmit, and transfer and attempt to transport, transmit, and transfer, monetary instruments and funds to a place in the United States from and through a place outside the United States, and from a place inside the United States to and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, a violation of IEEPA, contrary to Title 18, United States Code, Section 1956(a)(2)(A); and

b.    to transport, transmit, and transfer and attempt to transport, transmit, and transfer, monetary instruments and funds to a place in the United States from and through a place outside the United States, and from a place inside the United States to and through a place outside the United States,

knowing that the monetary instrument or funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, that is, a violation of IEEPA, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

### Objects of the Conspiracy

3.     The objects of the conspiracy were:

a.     To enrich the co-conspirators by conducting and promoting illegal business transactions with U.S. financial institutions using Chinese bank accounts established in the names of front companies to buy and sell commodities from foreign sellers and to make purchases using wire transfers to and from U.S. financial institutions;

b.     To conceal and disguise the nature, location, source, ownership, and the control of the proceeds of the business transactions that were conducted in violation of U.S. laws and regulations.

In violation of Title 18, United States Code, Section 1956(h).

## Count Three
### (International Emergency Economic Powers Act)

1.      The allegations set forth in Paragraphs 1 through 27 and 29 through 40 of Count One of this Indictment are incorporated and re-alleged by reference herein.

2.      From in or about March 2013 to in or about June 2013, in Essex County, in the District of New Jersey, and elsewhere, the defendants,

DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO. LTD.,
MA XIAOHONG,
ZHOU JIANSHU,
LUO CHUANXU, and
HONG JINHUA,

did knowingly and willfully violate and evade and avoid the restrictions imposed by the Office of Foreign Assets Control, U.S. Department of the Treasury, under the Weapons of Mass Destruction Proliferators Sanctions Regulations, Title 31, Code of Federal Regulations, Section 544.101, *et seq.*, by providing services on behalf of and for the benefit of a Specially Designated National, to wit, caused the provision of financial services and goods to and through the U.S. financial system for the benefit of and on behalf of Korea Kwangson Banking Corp., without first having obtained a license from the Office of Foreign Assets Control.

In violation of Title 50, United States Code, Section 1705(c), Title 31, Code of Federal Regulations, Sections 544.201 and 544.205, and Title 18, United States Code, Section 2.

**<u>Forfeiture Allegation as to Counts One And Three</u>**

1.      The allegations set forth in Paragraphs 1 through 27 and 29 through 40 of Count One and Paragraph 2 of Count Three of this Indictment are incorporated and re-alleged by reference herein.

2.      The United States hereby gives notice to the defendants,

DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO. LTD.,
MA XIAOHONG,
ZHOU JIANSHU,
LUO CHUANXU, and HONG JINHUA,

that, upon conviction of the offenses charged in Counts One and Three of this Indictment, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, of any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of Title 50, United States Code, Section 1705(c), and Title 18 United States Code, Section 371.  The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

### Forfeiture Allegation as to Count Two

1.     The allegations set forth in Paragraphs 2 and 3 of Count One and Paragraph 2 of Count Two of this Indictment are incorporated and re-alleged by reference herein.

2.     The United States hereby gives notice to the defendants,

DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO. LTD.,
MA XIAOHONG,
ZHOU JIANSHU,
LUO CHUANXU, and
HONG JINHUA,

that, upon conviction of the offense charged in Count Two of this Indictment, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 982(a)(1), of any property, real or personal, involved in the offense in violation of Title 18, United States Code, Sections 1956, or any property traceable to such property.  The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, involved in this offense, or any property traceable to such property.

### Substitute Assets Provision

3.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

       a.     Cannot be located upon the exercise of due diligence;

       b.      Has been transferred or sold to, or deposited with, a third party;

       c.     Has been placed beyond the jurisdiction of the Court;

       d.     Has been substantially diminished in value; or

  e. Has been commingled with other property that cannot be divided without difficulty;

It is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

A TRUE BILL

FOR ████████

_Craig Carpenito_
CRAIG CARPENITO
United States Attorney

_Deborah L. Connor (J.W.W.)_
DEBORAH L. CONNOR
Chief, Money Laundering & Asset Recovery Section
Criminal Division, U.S. Department of Justice

_Jay I. Bratt (CLF)_
JAY I. BRATT
Chief, Counterintelligence and Export Control Section
National Security Division, U.S. Department of Justice

CASE NUMBER: 19-514 (JMV)

**United States District Court**
**District of New Jersey**

UNITED STATES OF AMERICA

v.

DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT
CO. LTD, MA XIAOHONG, ZHOU JIANSHU, LUO CHUANXU, and HONG JINHUA

INDICTMENT FOR

18 U.S.C. §§ 371, 1956(h), 2 and 50 U.S.C. § 1705(c)



A T

Fo

CRAIG CARPENITO
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

DEBORAH L. CONNOR
CHIEF, MONEY LAUNDERING & ASSET RECOVERY SECTION
CRIMINAL DIVISION, U.S. DEPARTMENT OF JUSTICE

JAY I. BRATT
CHIEF, COUNTERINTELLIGENCE AND EXPORT CONTROL SECTION
NATIONAL SECURITY DIVISION, U.S. DEPARTMENT OF JUSTICE

JOYCE M. MALLIET
ASSISTANT U.S. ATTORNEY
NEWARK, NEW JERSEY
973-645-2876

CHRISTIAN FORD
JENNIFER WALLIS
TRIAL ATTORNEYS, DEPARTMENT OF JUSTICE

FILED
JUL 22 2019
AT 8:15
WILLIAM T. WALSH
CLERK